IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TRUSTEES OF THE CHICAGO REGIONAL COUNCIL OF CARPENTERS PENSION FUND, CHICAGO REGIONAL COUNCIL OF CARPENTERS WELFARE FUND, and CHICAGO REGIONAL COUNCIL OF CARPENTERS APPRENTICE & TRAINEE PROGRAM FUND, <br><br>      Plaintiffs, <br><br>  v. <br><br>UNION PAYROLL AGENCY, INC., <br><br>      Defendant. | No. 09 CV 6029 <br><br> Magistrate Judge <br> Michael T. Mason |

## **MEMORANDUM OPINION AND ORDER**

Michael T. Mason, United States Magistrate Judge.

  Plaintiffs, Trustees of the Chicago Regional Council of Carpenters Pension Fund, Chicago Regional Council of Carpenters Welfare Fund, and Chicago Regional Council of Carpenters Apprentice & Trainee Program ("plaintiffs"), filed this action under Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1132, and Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. §185. Plaintiffs contend that defendant Union Payroll Agency, Inc. ("UPA" or "defendant") owes plaintiffs $35,417.80 in additional benefit contributions on behalf of one individual, Christopher J. Rademacher, covering the period of December 2003 through March 2007. (Pls.' Mot. for Summ. J. at 2 [27].) Specifically, plaintiffs contend that, based on his salary and supervisory functions, Rademacher fell under certain "160 hour rule" provisions in the applicable Commercial Area Agreement, and thus defendant should have reported him at the minimum monthly amount of 160 hours for that time period.

Plaintiffs also seek to recover $12,711.01 in interest and $7,083.56 in liquidated damages, and request an award of their reasonable fees and costs. (Id.)

In September 2010, the parties consented to the jurisdiction of the undersigned judge for all future proceedings in this matter pursuant to 28 U.S.C. §636(c) [14]. This matter is currently before the Court on the parties' motions for summary judgment. For the reasons set forth below, plaintiffs' motion [27] is granted and defendant's cross-motion [25] is denied.

**BACKGROUND**[1]

To state that this is "not a typical ERISA case" is an understatement. (*See* Def.'s Reply at 3 [45].) Here, defendant is not a construction contractor directly employing individual union members such as carpenters. (*Id.*) In fact, defendant provides payroll services to businesses employing union labor in the entertainment, tradeshow, and sporting events industries nationwide. Those services include processing weekly payroll and, in certain situations, submitting monthly benefit report forms and contributions to union fringe benefit funds based on hours reported directly by clients via telephone or recorded on weekly time sheets. In exchange for defendant's services, defendant's clients agree to pay defendant an administrative fee along with payment for certain employees' wages, benefits, state and federal taxes, and insurance necessary to cover the clients' payroll.

The Chicago Regional Council of Carpenters (the "Union") negotiated a collective bargaining agreement (the "Commercial Area Agreement") with the Mid-America

---

[1] Unless otherwise noted, the facts set forth in this opinion are undisputed.

Regional Bargaining Association that was in effect from June 1, 2005 through May 31, 2008. (Pls.' Ex. 10 [30-11].) Among other things, that agreement states that it is "effective ... for and on behalf of the present and future members, together with such other employers who become signatory to this Agreement (referred to herein as "Employer or Employers") ...." (*Id.* at 1.)

In October 1998, defendant signed a Memorandum of Agreement with the Union, wherein defendant agreed to be bound by the Commercial Area Agreement. (Pls.' Ex. 13 [30-14].)[2] The Memorandum of Agreement defines defendant as the "EMPLOYER." (*Id.* at 1.) Under that agreement, defendant agreed, among other things, "to make prompt payments for the per hour contributions with respect to each Trust Fund for all Employees performing bargaining unit work and/or covered by the Agreement including nonbonded and nonsignatory subcontractors as required by the applicable provisions of each agreement." (*Id.* ¶ 3.)

In December 2003, defendant and Performance Tradeshow Group ("PTG"), a non-party in this case, entered into an agreement whereby defendant agreed to process payroll and union benefit contributions for PTG. PTG operated out of Las Vegas, Nevada, in the business of installing and dismantling tradeshow exhibits. From December 2003 through April 2007, Rademacher was president and 50% shareholder of PTG. Defendant and PTG's contract consisted of a one-page form, signed on behalf

---

[2] While the Memorandum of Agreement predates the effective dates of the applicable Commercial Area Agreement, the parties do not dispute that defendant agreed to be bound by the applicable Commercial Area Agreement. Indeed, the Memorandum of Agreement states that defendant would be bound by certain Area Agreements then in effect, and that the Memorandum of Agreement "shall continue in full force and effect through the full term and duration of all subsequent agreement(s)." (*Id.* ¶¶ 2, 4.)

of PTG by Rademacher with the surname "John," with PTG named as the "Client." (Pls.' Ex. 4 [30-5].)  Directly above that signature, the contract states:  "Client agrees to abide by all terms and conditions of Union Bargaining Agreement."  (*Id.*)  PTG has never been signatory to a collective bargaining agreement with the Union.  Rademacher first held a Union membership card in 1986 and was reported as a journeyman carpenter by signatory employers before December 2003.  During periods relevant to this lawsuit, Rademacher was a member of the Union, Local 10.

The parties do not dispute that the Commercial Area Agreement required defendant to pay monthly fringe benefit contributions to plaintiffs on behalf of covered employees.  Defendant expressly states as much in its cross-motion, and cites pages 14-22 of the Commercial Area Agreement as support.  The parties also agree that the Commercial Area Agreement required defendant to make contributions measured by the hours worked by subcontractors that are not signatory to an agreement with the Union.  Further, the parties do not dispute that defendant reported hours on behalf of Rademacher at the consistent rate of 80 and 100 hours per month from December 2003 through March 2007; that defendant paid benefit contributions to plaintiffs on behalf of Rademacher during that time period; and that by reporting at or around the minimum quarterly eligibility requirement of 250 hours, defendant enabled Rademacher to maintain health and welfare benefits through the Trust Funds on a weekly basis for approximately three years.[3]  Finally, the parties agree that, by way of state wage reports, payroll checks, W-2 statements, and Trust Fund contribution reports, defendant

---

[3]  Defendant based its payroll reports on hours submitted by Rademacher by facsimile.

represented to plaintiffs, among others, that Rademacher was defendant's employee. (Pls.' Ex. 9 [30-10]; Pls.' Ex. 7 ¶11 [30-8].)[4]

At the heart of this case is the parties' disagreement regarding whether three particular provisions of the Commercial Area Agreement, each embodying the so-called "160 hour rule," require defendant to make additional contributions on Rademacher's behalf. The first such section states:

> The EMPLOYER may make contributions for all hours worked by Superintendents and other management personnel for whom contributions to the Health and Welfare Fund were heretofore made when such individuals were employed as journeymen Carpenters. Such contributions shall be made in a monthly amount equal to at least 160 times the hourly contribution rate specified in this Article.

(Pls.' Ex. 10 §12.8.) Sections 13.6 and 14.6 contain identical reporting and payment requirements relative to plaintiffs' Pension Fund and Training Fund, respectively. (*Id.* §§13.6, 14.6.) According to the parties, "[t]he purpose of the '160 hour rule' is to allow employees who previously participated in the Trust Funds to continue to participate in the Plaintiffs' Health and Welfare Plans after they become supervisory or management employees of a signatory Employer and no longer perform bargaining unit work." (Pls.' Ex. 6 - J. Libby Decl. ¶ 7 [30-7]; Pls.' LR 56.1(b)(3) Resp. to Def.'s LR 56.1 Statement of Material Facts ¶ 31 [34].)

Additionally, the parties disagree in their characterizations of Rademacher's job

---

[4] Notwithstanding those representations, defendant's president Gary Wright testified at his deposition that the individuals listed on defendant's contribution reports were "not what we [defendant] consider our direct employees, no. They are employees that we have payroll for on behalf of our individual clients." (Pls.' Ex. 3 - G. Wright Dep. at 37-38 [30-4].) However, Wright later testified that, given defendant's submissions to various tax authorities, "in the eyes of the state and federal government, yes," "[t]hey would consider Mr. Rademacher an employee of UPA," "[b]ecause that's what we did. We payrolled Mr. Rademacher. Yeah, we employed him." (*Id.* at 44.)

responsibilities during the relevant time period. However, after reviewing the evidence submitted on that issue, we find no material issue of disputed fact. As a result, rather than parse the parties' submissions under Local Rule 56.1, this Court will summarize the pertinent evidence in the record before it.[5] During his deposition, when asked about his "personal responsibilities with" PTG (without any time period specified), Rademacher testified as follows:

> A. I had a variety of duties, Dave, sometimes I would be on the floor checking the labor in, making sure the guys were setting up the exhibits correctly.
> Q. What do you mean by making sure they set up the exhibits correctly?
> A. Well, we would give the guys a blueprint at 8:00 o'clock in the morning.
> Q. Are these carpenters?
> A. Not carpenters, in Las Vegas they're Teamsters, that's who has the jurisdiction at the convention center is Teamsters. So I would line the guys up, we might have a 30-man call, and I'd say, Manny, Mo, and Jack, here's a set of blueprints, go over to Booth 907, get started on it, verify your booth, verify your electrical layouts, and I'll come by in an hour, make sure you're on the right program.
> Q. Okay, did you ever assist in the installation work?
> A. No.
> Q. Never?
> A. No.
> Q. Okay.
> A. Because I was not part of the local Teamsters union out there.

(Pls.' Ex. 5 - Rademacher Dep. at 7-8 [30-6].) At no point during that portion of his testimony did Rademacher – or the attorney questioning him – use the word "supervise" to describe what Rademacher did at PTG's job sites. Subsequently, Rademacher testified as follows:

---

[5] Each side also requests that the Court strike portions or the entirety of some of the other side's statements of facts as supposedly unsupported by the evidence cited. Given our ruling herein, it is unnecessary for us to separately resolve those requests.

6

> Q. Last question, because I think we need some clarity.
> Q. When you were supervising Teamsters on the job sites, were you ever working with the tools?
> A. No.
> Q. You never once worked with tools?
> A. Dave, I worked with tools back in 1984. By the time I started this company, my tools were so rusty and my knees were so bad – no, I don't carry my tools anymore.

(*Id.* at 19-20.)[6] While here again, Rademacher did not use the word "supervise" to describe his responsibilities, he did not object to plaintiffs' counsel's use of the word in describing those responsibilities.

Additionally, when asked about his understanding of the relationship between PTG and defendant, Rademacher testified as follows:

> The understanding was that I hired them to do our payroll for all of our guys which they would do the union benefits, take out the taxes, make sure benefits were paid to Southwest Administrators which was way over my head – or I should also say over my head, but I didn't have the time to try and get into that, because I also ran the business, the banking, getting the insurance liability, keeping up with our – just trying to keep up with everything else to keep the company running, whether it was our American Express bills, our cell phone bills, you know, the whole gambit that it takes to run a business.

(Pls.' Ex. 5 at 8-9.) Rademacher also testified that, during the period of December 2003 through March 2007, he was never a corporate shareholder, an officer, or a supervisor of defendant. (*Id.* at 16.) The parties agree that during that time period, Rademacher paid himself, as co-owner of PTG, a yearly salary of approximately $50,000.00.

**LEGAL STANDARD**

Summary judgment is appropriate when the "pleadings, the discovery and

---

[6] While defendant contends that Rademacher never testified that he supervised at the job site, defendant does not dispute that Rademacher testified that he never assisted in the installation work and that he never worked with tools while working on the job site.

disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating there is no genuine issue of material fact, and judgment as a matter of law should be granted in their favor. *Id.* Once the moving party has met the initial burden, the non-moving party must offer more than a mere scintilla of evidence to survive summary judgment. *Roger Whitmore's Auto. Servs. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir. 2005). The non-moving party must produce specific facts showing there is a genuine issue of material fact, and that the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). All evidence and inferences must be viewed in the light most favorable to the non-moving party. *Id.* at 255.

**DISCUSSION**

In this case, there is no dispute over the material facts. The issue presented is solely one of contract interpretation – a question of law. *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560, 564-65 (7th Cir.1995). Resolution at the summary judgment stage is therefore appropriate. *Id.*; *accord LaSalle Nat'l Bank v. General Mills Restaurant Group, Inc.*, 854 F.2d 1050, 1052 (7th Cir. 1988) ("If a judge can make sense of a contract without hearing testimony, his duty is to construe the contract without letting the parties introduce any evidence other than the contract itself.").

Because this case was brought pursuant to ERISA and the LMRA, federal common law principles govern. *GCIU Employer Retirement Fund v. Chicago Tribune Co.*, 66 F.3d 862, 864-65 (7th Cir 1995); *Dexter Axle Co. v. International Ass'n of Machinists & Aerospace Workers, Dist. 90*, Lodge 1315, 418 F.3d 762, 766 n.1 (7th Cir.

2005).  When interpreting contracts under those principles, "terms are given their ordinary and popular meaning, the document is read as a whole with all its parts given effect, and related documents are read together."  *Temme v. Bemis Co., Inc.* 622 F.3d 730, 734 (7th Cir. 2010) (citations and internal quotations omitted).  Contract language is ambiguous "if there is more than one reasonable interpretation of it, and only if the ambiguity is not clarified elsewhere in the document will a court resort to extrinsic evidence of the parties' intent."  Id. at 734-35.

While both parties contend that §§ 12.8, 13.6, and 14.6 are unambiguous, they dispute whether those provisions require defendant to make additional contributions on Rademacher's behalf.  Again, those provisions state:

> The EMPLOYER may make contributions for all hours worked by Superintendents and other management personnel for whom contributions to the [Health and Welfare Fund, Pension Fund and Training Fund] were heretofore made when such individuals were employed as journeymen Carpenters.  Such contributions shall be made in a monthly amount equal to at least 160 times the hourly contribution rate specified in this Article.

For their part, plaintiffs argue that because Rademacher was a former journeyman carpenter who had previously been reported to plaintiffs, and because he worked in a managerial position during the period defendant reported and made contributions on his behalf, defendant's contributions should have been at the minimum rate of 160 hours per month.  For its part, defendant maintains that because it – defendant Union Payroll Agency – never employed Rademacher as a superintendent or manager, defendant is not obligated to make any further contributions on his behalf.

Defendant relies heavily on the fact that John Libby, the Audit & Collections Manager of plaintiffs' Employer Contributions Department, stated in a declaration that

9

the purpose of the 160 hour rule is to allow certain employees to "continue to participate in the Welfare and Pension Funds *after they become supervisory or management employees of a signatory Employer* and no longer perform bargaining unit work." (Pls.' Ex. 6 - John Libby Decl. ¶ 7 - emphasis supplied.) Defendant contends that the emphasized language "clearly expresses the parties' intent that an employee does not fall within the scope of sections 12.8, 13.6 and 14.6 unless the employee becomes a supervisory or management employee of a signatory Employer."

Putting aside the unsupported mind-reading implicit in defendant's argument, this Court need not delve into what the parties may have intended with respect to the 160-hour rule provisions. Indeed, "post-formation interpretations say nothing about what was intended at the time in which the parties entered into the agreement." *Ooley v. Schwitzer Div., Household Mfg. Inc.*, 961 F.2d 1293, 1299 (7th Cir. 1992). Here, the plain language of the provisions at issue, and consideration of other provisions in the Commercial Area Agreement, require the conclusion that the provisions in fact required defendant to make additional contributions on Rademacher's behalf.

First, notwithstanding Mr. Libby's declaration, the provisions at issue do not expressly refer to the entity employing "the Superintendents and other management personnel" involved. The provisions refer simply to "Employer" making certain contributions on certain individuals' behalf. As for the definition of "Employer," the Commercial Area Agreement states that it is "effective ... for and on behalf of the present and future members, together with such other employers who become signatory to this Agreement," and collectively defines those entities as "Employer or Employers." (Pls.' Ex. 10 at 1.) Further, the parties' Memorandum of Agreement, wherein defendant

10

agreed to be bound by the Commercial Area Agreement, expressly defines defendant as "Employer."  (Pls.' Ex. 13 at 1, ¶¶ 2, 4.)  Thus, the requirement that defendant must itself employ Rademacher in a managerial capacity simply does not exist based on a plain reading of the provisions at issue.

Second, defendant's argument fails to account for the fact that defendant considered itself to be an "Employer" vis a vis Rademacher for purposes of other provisions of the Commercial Area Agreement.  In defendant's own words, "[t]he Commercial Area Agreement required UPA to pay monthly fringe benefit contributions to the plaintiffs on behalf of covered employees," and "pursuant to the Commercial Area Agreement, UPA submitted monthly benefit contributions to the Plaintiffs on behalf of Rademacher."   (Def.'s Mem. at 4, 5 [26].)  Thus, defendant clearly considered itself to be an "Employer" for purposes of making benefit contributions under various sections of the Commercial Area Agreement other than the 160-hour rule provisions disputed here.  However, the Agreement contains only one definition of "Employer."  Defendant has provided no explanation to this Court – and we cannot fathom one – wherein defendant should be considered the "Employer" for purposes of some of the Agreement's provisions but not others.  "[I]t is well established that we are to read collective bargaining agreements as a whole." *International Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 406 (7th Cir. 2002) (citation omitted). Thus, defendant, as "Employer," must fulfill all of the applicable obligations under the Commercial Area Agreement, not just those of defendant's picking and choosing.[7]

---

[7] While not necessary to our holding or discussed by either party, ERISA provides that: "The term 'employer' means any person acting directly as an employer, or indirectly in the interest of

11

Notably, defendant's argument also has ridiculous implications. Taken to its "logical" conclusion, the disputed provisions would only apply to defendant when a journeyman carpenter quits working for a construction contractor or subcontractor and becomes employed as a manager for *a payroll company*. The record before us provides no support for such a career move to trigger applicability of the disputed provisions. And what to make of the word "Superintendents" under such an interpretation? We cannot conceive – and again, defendant fails to explain – what sort of work payroll companies engage in that might require employment of a superintendent. We decline to endorse such a reading of those provisions. *Ooley*, 961 F.2d at 1301.

In sum, we conclude that defendant is an "Employer" under Commercial Area Agreement for purposes of §§ 12.8, 13.6, and 14.6 and must comply with those provisions. However, that conclusion does not end the matter. As the parties note, those provisions are "permissive" – that is, it is only *if* an Employer makes contributions for certain "Superintendents or other management personnel" that it *must* make those contributions in a monthly amount equal to at least 160 times the specified hourly

---

an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity." 29 U.S.C.A. § 1002(5). Here, defendant does not appear to have acted directly as Rademacher's employer, *i.e.*, by directly employing him, as that phrase is conventionally, such as by interviewing, hiring, and sending him to job sites as a journeyman carpenter or in any other capacity. Instead, the relationship defendant had with Rademacher was by virtue of defendant's assuming responsibility for PTG's payroll and fund contributions. But in voluntarily undertaking those responsibilities, defendant agreed to represent itself to plaintiffs as the employer of the individuals on behalf of whom it reported. ERISA's definition of "Employer" appears to specifically account for such a relationship, as it includes "any person acting ... indirectly in the interest of an employer." As a result, whether or not defendant "employed" Rademacher in the direct sense – as a manager or otherwise – does not affect its obligations under the disputed provisions of the Commercial Area Agreement.

contribution rate. While the parties have dueling characterizations of Rademacher's job responsibilities, the substance of his testimony went uncontradicted. Rademacher testified that his duties included "checking the labor in," "making sure the guys were setting up exhibits correctly," "distributing blue prints and directing employees to commence work," and verifying that employees were "on the right program." He also responded "no" when asked "[w]hen you were supervising Teamsters on the job sites, were you ever working with tools?" That evidence squarely supports the conclusion that Rademacher acted in a managerial capacity. As a result, because defendant opted to make contributions on Rademacher's behalf, §§ 12.8, 13.6, and 14.6 required defendant to make those contributions in a monthly amount equal to at least 160 times the specified hourly contribution rate. Thus, plaintiffs are entitled to summary judgment as to defendant's liability under the Commercial Area Agreement for the difference between the amount defendant contributed on Rademacher's behalf and the amount defendant should have contributed pursuant to §§ 12.8, 13.6, and 14.6 of that Agreement.

As for the amount owed by defendant, the parties do not appear to dispute the amount of unpaid contributions, $35,417.80. While the parties' LR 56.1 statements make no reference to that amount, counsel agreed that was the approximate amount at issue during a November 10, 2010 status hearing before this Court. Further, in connection with their summary judgment motion, plaintiffs' accountant submitted a sworn itemization of the amounts due for unpaid contributions ($35,417.80), as well as liquidated damages ($7,083.56), and interest ($12,711.01). (*See* Pls.' Ex. 6(b) [30-7].) Having no reason to doubt the accuracy of those calculations, we hold that plaintiffs are

13

entitled to judgment against defendant in the amount of $52,212.37.

**CONCLUSION**

For the foregoing reasons, plaintiffs' motion for summary judgment [27] is granted and defendant's cross-motion for summary judgment [25] is denied. Pursuant to Fed. R. Civ. P. 58, the Clerk is directed to enter judgment in this matter in favor of plaintiffs and against defendant in the amount of $52,212.37 (for $35,417.80 in unpaid contributions, $7,083.56 in liquidated damages, and $12,711.01 in interest). Pursuant to 29 U.S.C. §1132 (g)(2)(D), plaintiffs are entitled to their reasonable attorney's fees and costs of the action. With respect to attorney's fees, the parties shall proceed in accordance with Local Rule 54.3. With respect to costs, plaintiffs shall file their bill of costs by 8/29/11. Any objections by defendant shall be filed by 9/12/11. The parties are very strongly encouraged to reach agreement on fees and costs.

It is so ordered.

ENTERED:

_____
MICHAEL T. MASON
United States Magistrate Judge

Dated: August 15, 2011